STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. EDGAR SMITH, PETITIONER-APPELLANT.

Argued June 2, 1964—Decided July 7, 1964.

*Mr. Stephen Toth, Jr.,* argued the cause for appellant.

*Mr. William C. Brudnick,* Assistant Prosecutor, argued the cause for respondent (*Mr. Guy W. Calissi,* Bergen County Prosecutor, attorney).

The opinion of the court was delivered

PER CURIAM. On March 4, 1957 Victoria Zielinski, a 15-year-old girl, was murdered. Defendant was convicted of the crime and sentenced to death on June 4, 1957. The judgment was affirmed on June 25, 1958. *State v. Smith,* 27 *N. J.* 433 (1958). On August 8, 1958 defendant moved for a new trial. His motion was denied and we affirmed the order on May 4, 1959. *State v. Smith,* 29 *N. J.* 561 (1959). The United States Supreme Court denied *certiorari* on October 19, 1959. *Smith v. New Jersey,* 361 *U. S.* 861, 80 *S. Ct.* 120, 4 *L. Ed.* 2d 103.

On November 19, 1959 defendant applied to the United States District Court for a writ of *habeas corpus.* The proceedings there were concluded by an opinion dated January 18, 1962. *United States ex rel. Smith v. New Jersey,* 201 *F. Supp.* 272 (*D. N. J.* 1962). The United States Court of Appeals affirmed on July 24, 1963 and denied a rehearing on September 9, 1963. 322 *F.* 2d 810 (3 *Cir.* 1963). *Certiorari* was denied by the United States Supreme Court on February 17, 1964. *Smith v. New Jersey,* 376 *U. S.* 928, 84 *S. Ct.* 678, 11 *L. Ed.* 2d 623.

The United States District Court in the proceedings just referred to declined to consider eight points on the ground that defendant had not presented them to the state courts and hence had not exhausted his state remedy. On March 18, 1964 defendant petitioned the trial court for post-conviction relief, asserting the points just mentioned, together with still others. Defendant asked that counsel be assigned and that application was granted. Assigned counsel added additional claims. The trial court denied relief after argument, and that action is now before us for review.

■ At the outset we refer to defendant's efforts to dismiss assigned counsel. The phenomenon is not new. See *State v. Rinaldi,* 58 *N. J. Super.* 209, 214 (*App. Div.* 1959), *cert.* denied 366 *U. S.* 914, 81 *S. Ct.* 1089, 6 *L. Ed.* 2d 238 (1961). Too often defendants who petition for counsel on the plea that

they are indigent and unable to represent themselves seek to supervise assigned counsel and even question his integrity if his performance does not satisfy the defendant's critical eye. From time to time counsel so situated understandably ask to be relieved. It is our policy to refuse such requests. We appreciate that untutored defendants insist upon urging points which are so frivolous as possibly to reflect upon an attorney who presses them, but counsel may be assured the courts understand and will not charge inanity to them. Our rule dealing with post-conviction relief provides in *R. R.* 3:10A–6(d):

"The court will not substitute new assigned counsel at the request of defendant while assigned counsel is serving. Assigned counsel may not seek to withdraw on the ground of lack of merit of the petition. Counsel should not be reluctant to advance any grounds insisted upon by defendant notwithstanding he deems them without merit."

Counsel of course may properly acknowledge that a point is contrary to existing law and leave it to the court to decide whether there should be a departure from it.

██ In addition, in these situations we permit a defendant to file his own brief as well. Accordingly when we denied defendant's motion to dismiss assigned counsel (we need hardly add that defendant's complaint was wholly unwarranted), we informed defendant that he could file an additional brief and adjourned the argument date to that end. Defendant did file his own brief of 25 pages and after the oral argument sent a letter commenting upon the course of the oral argument as someone reported it to him. We understand defendant applied to the United States District Court for the District of New Jersey for an order restraining assigned counsel from appearing before us, which application the District Court denied.

We note that in the brief defendant himself filed he advances the question "Does this Court have the authority to deny a person the right to retain private counsel, or act as counsel for himself, and to force upon him the counsel of

the Court's choice?" The question is so phrased as to suggest that defendant had retained counsel of his own. No such representation was made in defendant's efforts to have assigned counsel relieved and no such assertion is affirmatively made in defendant's own brief. At the oral argument, assigned counsel stated in response to our question that he had no information to that effect.

Before dealing with the individual points, we should note two principles, one or the other of which disposes of most of the questions raised. One principle is that a post-conviction proceeding may not be used as a substitute for an appeal from the judgment of conviction. All alleged errors inhering in a trial must be asserted in a direct review from the conviction, the sole exception being an error which denies fundamental fairness in a constitutional sense and hence denies due process of law. The second principle is that an issue, even of such constitutional dimensions, once decided, may not be relitigated. These principles are stated in *R. R.* 3:10A–2, 3, 4, and 5.

(1) The first question is whether petitioner was unlawfully arrested. There are a host of answers. The arrest was plainly proper;. probable cause existed. Moreover the legality of the arrest as such has no bearing upon the validity of the conviction. And if the voluntariness of the confession is sought to be questioned on the basis of the arrest, the answer is that the validity of the confession has been fully adjudged both in the state and federal courts.

(2) Defendant complains that objections to the trial court's charge were not taken before the jury retired to consider its verdict as provided in *R. R.* 3:7–7(b). We cannot detect the grievance. No objection made by defendant to the charge was rejected on the ground that it was made after the jury had retired. Moreover this complaint, whatever its precise content may be, had to be urged on the main appeal.

(3) The trial court submitted the case to the jury on the theory of a "willful, deliberate and premeditated kill-

ing." *N. J. S.* 2A:113-2. The trial court overruled the State's position that the case should also go to the jury on the theory of a felony-killing in the course of an attempted rape. The complaint now is that the trial court should have affirmatively instructed the jury that that thesis was not before it. There was no request to charge or objection on behalf of defendant. We see no room for misunderstanding since the trial court, after reading the statute, expressly confined the issue to the single theme. Finally, the issue is not a constitutional one and could have been advanced only on direct appeal.

 (4) The next point appears to be that testimony offered in the absence of the jury on the voluntariness of the confession was not repeated in the presence of the jury. The opportunity to do so was not denied defendant. His then counsel, a seasoned lawyer with much experience in criminal matters, made a policy decision not to repeat it. The reason probably was that voluntariness was not really disputed. We see no constitutional question and hence the issue is foreclosed because it was not raised on appeal. We add that if the complaint is here advanced as part of the challenge to the validity of the confession, the topic has been fully adjudged in the state and federal courts.

 (5) The next point was submitted by counsel for defendant by a letter addendum to his brief. The complaint is that the trial judge informed the jury he had found the confession to be voluntary. This objection is not of constitutional dimensions and may not be raised in a post-conviction proceeding. In any event, there was no error. At the time of the trial, the established practice was for the judge alone to pass upon voluntariness of a confession and to leave to the jury only the issue of its credibility. In *State v. (Clarence) Smith,* 32 *N. J.* 501 (1960), a majority of the Court in a concurring opinion held that the trial court must pass on voluntariness as theretofore but should also, if the confession is received, instruct the jury independently to consider voluntariness and to reject the confession if the jury finds it to be

involuntary. Since the jury would then have to pass on voluntariness, we added "The jury should not at any time be informed of the trial court's finding of voluntariness" (32 *N. J.*, at *p.* 560), to the end that the jury might not be unduly influenced by the trial court's finding on the same issue. In thus adopting a new approach to the subject, the concurring opinion expressly held it would apply only to future trials and in fact the judgment of conviction was there affirmed (32 *N. J.*, at *pp.* 557–558) :

"\* \* \* There are a number of competing views, each of which commands respectable authority. The question is not whether the rule applied in this case is demonstrably wrong or unfair. Indeed that rule, adopted by our predecessors after conscientious consideration and embraced by three members of the court, is supported by the numerical weight of decisions elsewhere. Although we may prefer a given approach, we cannot reasonably maintain that ours is the single sound view of the matter. In these circumstances, we are unable to hold there was error in this case and hence we join in an affirmance. Since, however, we, a majority of the court, do prefer another approach, we are stating our views for the future guidance of the trial bench."

We add that in the present case the trial court itself passed upon voluntariness and thus accorded defendant his full constitutional due as just expounded in *Jackson v. Denno*, 84 *S. Ct.* 1774 (*U. S. Sup. Ct.* June 22, 1964).

 (6) Defendant says the trial court should have submitted the issue of manslaughter to the jury. There was no such issue projected in the trial, no request to charge, nor any objection to the charge, and surely the alleged error could not be deemed of fundamental reach in view of the finding of murder in the first degree. In any event, there was no evidence whatever to support a finding of manslaughter, there being neither proof of conduct by the deceased constituting provocation, nor proof in the State's case or in the defense that defendant killed the deceased in a heat of passion induced by such provocation, see *State v. King*, 37 *N. J.* 285, 300 (1962). Hence there was no issue for the jury. See *State v.*

*DiPaolo,* 34 *N. J.* 279, 298–299 (1961); *State v. Moynihan,* 93 *N. J. L.* 253, 255–256 (*E. & A.* 1919).

(7) It is alleged that the trial court's charge to the jury was prejudicial, inflammatory and virulent in the extreme. The portions criticized are largely a repetition of the testimony and comments upon it in relation to the essential ingredients of the crime. A trial judge has considerable latitude in this area. *State v. Begyn,* 34 *N. J.* 35, 53 (1961). We see no issue in terms of fundamental unfairness. At most the question would be one of misuse of discretion, an issue which could be raised only in an original appeal.

(8) Defendant asserts his motion for a new trial should have been granted. The issues on the motion were fully adjudged, *State v. Smith,* 29 *N. J.* 561 (1959), *cert.* denied 361 *U. S.* 861, 80 *S. Ct.* 120, 4 *L. Ed. 2d* 103 (1959). That determination is conclusive.

(9) For the first time defendant protests that a pair of pigskin gloves was obtained by an illegal search and seizure. The gloves were found at the trailer home of defendant which was then unoccupied and unlocked. The detectives were actually looking for defendant's trousers. The offer of the gloves was not challenged at the trial and hence the full circumstances of the seizure were not developed. Specifically it does not appear whether defendant authorized the entry; the record does indicate that defendant had been cooperating with the detectives in the search for the trousers which ultimately were found elsewhere. At any rate, defendant in the brief he himself prepared now asserts that the entry was made "without permission" (he refers merely to the trial record, which is silent on the subject), and since no testimony was taken on this post-conviction proceeding, we will assume for argument that the entry was thus unauthorized.

Actually the gloves had no apparent probative value. The testimony of John P. Brady, a chemist and toxicologist, revealed that the gloves were not stained with blood or human tissue, and hence it is most unlikely that defendant could have

worn them when he battered his victim. Brady said only that he found "particles of siliceous matter similar to the particles we recovered from the car here and also from the stones that were stained with blood." There of course is nothing unusual about siliceous matter and since defendant lived near the immediate scene of the murder and on his own testimony was at the sandpit with the car, the gloves were of no real evidential value. Indeed the testimony would aid the defendant if it were believed that he wore them throughout the evening of the murder, for the deceased was horribly battered and it is almost inconceivable that the hands of the murderer would not have been stained. In his summation to the jury, defendant's trial counsel pointed out that the gloves had no probative value against his client since the examination revealed no blood or "particles of human tissue, particles of bone like those which existed at the scene of the death." It is true that the prosecutor incorrectly asserted in his summation that there was blood on the gloves, but the prosecutor's mistake does not add anything to the force of the exhibit insofar as the immediate issue is concerned. The fact remains that the exhibit had little or no evidential strength. The devastating tangible proof against defendant consisted of his blood-stained trousers, socks and shoes, and the blood stains in the automobile he drove the night of the killing. But even assuming the evidential thrust of the gloves was great, still defendant cannot be relieved of that evidential truth in this proceeding.

This case was tried before *Mapp v. Ohio,* 367 *U. S.* 643, 81 *S. Ct.* 1684, 6 *L. Ed. 2d* 1081 (1961), was decided. That case held the state courts must reject evidence obtained by an unreasonable search in violation of the Fourth Amendment. The question is whether fundamental fairness demands that that decision must be given retroactive effect in a collateral attack upon a prior judgment which is no longer subject to direct appeal.

Most courts have held that *Mapp* does not thus apply retroactively. *United States ex rel. Angelet v. Fay,* 333 *F. 2d* 12

(2 *Cir.* June 11, 1964); *United States ex rel. Linkletter v. Walker,* 323 *F.* 2d 11 (5 *Cir.* 1963); *Gaitan v. United States,* 317 *F.* 2d 494 (10 *Cir.* 1963); *Commonwealth ex rel. Wilson v. Rundle,* 412 *Pa.* 109, 194 *A.* 2d 143 (*Sup. Ct.* 1963); *Villasino v. Maxwell,* 174 *Ohio St.* 483, 190 *N. E.* 2d 265 (*Sup. Ct.* 1963); *Moore v. State,* 41 *Ala. App.* 657, 146 *So.* 2d 734 (*Ct. App.* 1962); *People v. Muller,* 11 *N. Y.* 2d 154, 227 *N. Y. S.* 2d 421, 182 *N. E.* 2d 99 (*Ct. App.* 1962), *cert.* denied 371 *U. S.* 850, 83 *S. Ct.* 89, 9 *L. Ed.* 2d 86 (1962); *contra, Hall v. Warden, Maryland Penitentiary,* 313 *F.* 2d 483 (4 *Cir.* 1963), *cert.* denied 374 *U. S.* 809, 83 *S. Ct.* 1693, 10 *L. Ed.* 2d 1032 (1963); *Hurst v. People of State of California,* 211 *F. Supp.* 387 (*N. D. Cal.* 1962), affirmed 325 *F.* 2d 891 (9 *Cir.* 1963).

We subscribe to that view. *State v. Kaiser,* 80 *N. J. Super.* 176 (*App. Div.*), certif. denied 41 *N. J.* 200 (1963), *cert.* denied 376 *U. S.* 950, 84 *S. Ct.* 966, 11 *L. Ed.* 2d 970 (1964); *State v. McNulty,* 84 *N. J. Super.* 30 (*App. Div.* May 27, 1964). Our reasons are stated at length in *State v. (James) Smith,* 37 *N. J.* 481 (1962), at *p.* 483 *et seq.,* and need not be repeated.

(10) Here defendant asserts, without particularization, that trial counsel of his own selection "was, to be charitable, quite inadequate." We find no basis for the point.

(11) Next is a catch-all allegation that all of the alleged errors add up to a denial of due process. We see no merit in the claim.

(12) Defendant asserts for the first time that the trial court's charge with respect to the jury's role on punishment was inadequate. The criticism is that the court did not directly say that if the jury failed to recommend life imprisonment, the death penalty would be imposed. There was no objection or request to charge. We do not see how the jury could have had the slightest misunderstanding either as to their responsibility or as to the meaning of a verdict in which the recommendation was omitted. Moreover, although it

may be that a total failure to charge would constitute a denial of fundamental fairness remediable upon a post-conviction proceeding, disputes as to the clarity of a charge must be asserted upon a direct appeal.

■ (13) Defendant asserts he was denied a fair trial because the public was inflamed by the viciousness of the murder. We see no facts which could support a constitutional challenge. Indeed there is not even the question whether the trial court misused its discretion since the issue was not raised before or at trial. There was no motion to postpone or for change of venue. And an impartial jury was obtained.

Defendant adds a naked assertion that the trial had a "Roman Circus" atmosphere. The record lends no support. Nor do the newspaper clippings which have been submitted to us.

At the oral argument of this application, present counsel said he had been informed that at the trial the judge left the bench to regain his composure. There is nothing in the trial record itself with respect to the subject. In response the trial judge acknowledged an incident, saying that at one point he did fear he might be overcome by some of the proof and that he left the bench to guard against it. There is nothing whatever to indicate the jury knew why the judge left the bench and no basis to suggest the jury drew any inference from it.

■ (14) Defendant says the trial court failed to charge on the subject of alibi, citing *State v. Searles*, 82 *N. J. Super*. 210 (*App. Div.* 1964). Obviously this is the kind of an alleged error that can be asserted only on a direct appeal. At any rate there is no substance to the claim. Defendant did not assert an alibi at trial in the sense of a claim that he was at some precise place at the time of the murder and hence could not physically have committed the crime. See *State v. Mucci*, 25 *N. J.* 423, 431 (1957). Rather defendant simply denied that he killed the deceased, asserting she was alive when he last saw her in the area where she was slain. There was therefore no occasion for a special charge as to alibi, none

was requested, and no objection was made to its omission. The trial court of course charged that the State had to prove guilt beyond a reasonable doubt, and this charge was wholly adequate.

(15) Prior to trial defendant applied to the court for arrangements for the administration of so-called "truth serum." The State opposed, perhaps to avoid any idea that the results would be deemed to be evidential. In any event the defense invited the State to have its representatives present. The drug was administered with defendant's consent in the presence of four physicians, two selected by the defense and two by the State. In his affidavit in the United States District Court, one of the State's doctors commented, "The procedure used, popularly described as 'truth serum' has nothing to do with truth and is not a serum." At any rate the doctors made their notes and apparently a doctor for the State made a recording which is no longer available.

At first we thought defendant contended the State withheld the results of the test, but the record is now clear that counsel for defendant was fully informed by the physicians the defense selected as to what transpired. Indeed the defense had that information prior to trial but made no effort to use it.

The charge now is that as the result of defendant's disclosures at that examination the State learned of a baseball bat which it found a few days later and which undoubtedly was one of the lethal weapons used upon the deceased. It is agreed that during the examination defendant referred to a baseball bat, but no one suggests he then admitted that he struck the deceased with it or revealed the disposition of the bat. On the contrary, it seems to be agreed that defendant's story at the examination was pretty much the same as his testimony at the trial wherein he denied that he struck the deceased at all. Defendant simply argues that the time relation between the examination and the finding of the bat is such that one should infer that the State located the bat because of some disclosure by defendant. The State counters with the assertion that the

bat was discovered in this way: The morning after the murder a hank of decedent's hair matted with blood had been found near the entrance to the sandpit area and some distance from the spot where she was later battered. The detectives reasoned that an instrument used at the place first mentioned might have been discarded nearby. Hence they went to that spot and threw heavy stones in all directions. One rock virtually landed on the bat. Actually, the State says, it had expected to find a rock, rather than a bat. We gather that one bat was already in hand and the State did not realize there had been a second bat in the automobile in which defendant took the deceased to the sandpit area.

We have outlined the respective assertions, not to choose between them since neither represents a sworn presentation, but simply to indicate that we should not surmise the State learned of the lethal weapon in the manner now projected by defendant. Defendant made no effort to sustain his hypothesis through the physicians of his own selection who were present at the examination.

■■ But even if we assume the State located the bat in that way, still there is no basis for complaint. The defense did not raise the issue at trial as it could have if it contended the State made improper use of the examination, cf. State v. Kociolek, 23 N. J. 400, 412 (1957), and hence an inquiry now is foreclosed. But the ultimate answer on the merits is that the arrangements for the examination were made on defendant's application and with his agreement, and the State's physicians were present upon defendant's invitation.

■■ (16) Defendant himself adds the point that at the trial counsel of his own choice, in the cross-examination of a detective, asked whether defendant had not offered to submit to a lie detection test, to which the witness answered that defendant had not and in fact had declined to do so. Perhaps counsel was attempting to make capital of the "truth serum" examination mentioned above. Although the State itself could not have made that inquiry, State v. Driver, 38

*N. J.* 255, 260 (1962), a defendant cannot complain if his counsel ventures into a difficult area and gets a disappointing answer. We add that counsel at that point suggested by his further questioning that the result of such a test would not be evidential. We note also that the prosecutor did not refer to the subject in his summation. We see no error of such constitutional stamp as will support a collateral attack.

(17) By letter dated June 22, 1964 addressed to the Chief Justice, defendant stated:

"Today, June 22nd, the United States Supreme Court handed down a new, far-reaching decision on this very important question. The Court has declared inadmissible in State prosecutions those confessions obtained before the accused is permitted to confer with counsel. While I have not as yet read the Court's opinion, I do know that the question presented fits exactly my case. * * *"

Defendant asks that we delay determination of the present appeal until he prepares a further brief.

Defendant refers to *Escobedo v. Illinois,* 84 *S. Ct.* 1758 (*U. S.* June 22, 1964), where it was found that the prosecution had refused to permit the accused to consult with counsel and where the majority concluded "We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession —our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer."

We see no reason to delay this matter, but we will deal with the issue as tendered in defendant's letter to the end that there will be no question as to whether he has exhausted his state remedy in that regard.

Defendant does not say he was denied a request to see counsel at any point prior to his confession. Rather defendant appears to say only that he in fact did not see a lawyer before he confessed, a circumstance which would not invoke *Escobedo.* The testimony at the trial shows that defendant was not held incommunicado. Before he confessed he was

visited by his wife, and at his request a priest of his own choice met with him privately. Although at one time the rule may have been otherwise, see *State v. Murphy,* 87 *N. J. L.* 515, 527–532 (*E. & A.* 1915), it was settled as of the time of defendant's trial that a refusal of counsel (assuming defendant now asserts such refusal) was a relevant fact on the issue of voluntariness, *Cicenia v. LaGay,* 357 *U. S.* 504, 509, 78 *S. Ct.* 1297, 2 *L. Ed. 2d* 1523, 1528 (1958) ; *State v. Grillo,* 11 *N. J.* 173, 180–181 (1952) ; *cf. State v. Pierce,* 4 *N. J.* 252, 263 (1950), and hence evidence to that effect was admissible under the state of the law when defendant was tried. Accordingly defendant had a full opportunity to offer such proof if in truth it had any reality. Such an assertion being part and parcel of the issue of voluntariness, it is concluded by our prior judgment and as well by the judgment in the federal courts upholding the confession. We need not consider the further question whether *Escobedo* must be applied retrospectively in a collateral attack upon a judgment which antedates it.

The order is accordingly affirmed. The stay of execution heretofore granted is vacated.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.